J.G.C. ("the child") was placed in the custody of the Mobile County Department *Page 253 
of Human Resources ("DHR") pursuant to a December 18, 2001, order of the trial court. On September 4, 2002, DHR petitioned to terminate the parental rights of S.H. ("the mother") and W.C. ("the father") to the child. T.B.D., the mother's first cousin, and her husband, C.H.D. (hereinafter sometimes referred to as "the maternal cousins"), filed a motion to intervene, and on November 13, 2002, they petitioned the trial court for custody of the child. On March 28, and April 1, 2003, the trial court conducted a hearing in which it received ore tenus evidence. The father was present and testified on March 28, 2003; however, the record reveals that the father was not present at the April 1, 2003, continuation of the hearing. On April 4, 2003, the trial court entered an order terminating the parental rights of the mother and the father and awarding the maternal cousins legal custody of the child. Only the father appealed.
The pertinent facts are as follows. At the age of 16, the mother was married to C.H.; four children were born of that marriage.[1] The mother and C.H. separated, and the mother entered into a relationship with the father. The mother became pregnant as a result of that relationship. The father testified that the child was his; the mother also informed DHR of the same. The child was born on April 21, 2000. Shortly after the child was born, the father was convicted of driving under the influence, domestic violence, and contributing to the delinquency of a minor and was subsequently incarcerated in Florida for five and one-half months.
While the father was incarcerated in Florida, the child was originally in the custody of the mother; however, the child was later adjudicated dependent by the Florida Department of Health and Rehabilitative Services ("HRS") and was placed in foster care. HRS returned custody of the child to the mother on October 28, 2001; thereafter, the mother moved, with the child, to Mobile, Alabama, to live with relatives. Three days later, on November 1, 2001, the mother's grandparents called DHR and requested assistance with the child after the mother did not return home one day from work. On November 5, 2001, the child was placed in the home of the maternal cousins, who cared for the child for approximately four months until returning the child to the custody of DHR. DHR placed the child in foster care, and, in November 2002, the child was returned for a second time to the temporary custody of the maternal cousins after they petitioned for custody of the child.
At the time of the hearing in this matter, the father was 27 years old. The father testified that he was released from jail in August 2001 and that, within one month of being released, he moved from Florida to California to "regain stability." The father testified that he has immediate family that lives in California. Sharniece Green, a DHR social worker, testified that the mother informed her that the father was in California. Green eventually contacted the father at his grandmother's home in California where the father had been living. According to Green, the father expressed an interest in gaining custody of the child and told her that he would contact her. Green testified that after her one conversation with the father she did not hear from the father again.
The father testified that shortly after he moved to California he was convicted for driving under the influence. The father *Page 254 
testified that, sometime thereafter, he was arrested for assault with a deadly weapon following an altercation in which he stabbed a man twice with a knife. The father was jailed in July 2002; the father posted bond after serving three and one-half months in jail.[2] The father testified that while he was in jail he lost contact with Green. The father was served with DHR's petition to terminate his parental rights in September 2002 while he was incarcerated in California.
The father testified that after he moved to California he worked for his grandfather's construction business and that he also worked for a flooring company. The father testified that, at the time of trial, he had arranged to work for a company that installed fluorescent lights but that he had yet to be officially hired. The father also testified that he had looked into renting an apartment and had found a day-care facility for the child to attend if he were to gain custody of the child. The father testified that, at the time of trial, he lived in a one-bedroom mobile home on his grandparents' property. Green testified that the HRS case plan in Florida required that the father attend a drug-treatment program and an anger-management program. However, Green was unaware if the father had completed the programs.
The father testified that he called the child when he could but that his busy schedule in California prevented him from calling often. The father also testified that he was unable to visit the child because of the long distance between their residences. T.B.D., a maternal cousin, testified that she and her husband, C.H.D., had had custody of the child since November 2002. According to T.B.D., the father had visited the child once. That visit occurred immediately following a November 2002 hearing at which the trial court awarded the father supervised visitation with the child. T.B.D. testified that the father had only called the child three times since that hearing. According to T.B.D., the father sent a card to the child at Christmas. The father testified that he had never paid child support for the child.
T.B.D. testified that she first had custody of the child from November 2001 until March 2002. T.B.D. testified that she and C.H.D. had returned the child to the custody of DHR after the mother and the maternal grandmother were in a physical altercation in front of T.B.D. and C.H.D.'s daughters. T.B.D. testified that the police were called and that her daughters were questioned following the incident. According to T.B.D. and C.H.D., caring for the child at that time jeopardized the safety of their immediate family, specifically their three children, who were 17, 16, and 13 years old at the time of the hearing. Green testified that the maternal cousins continued to exercise visitation with the child after the child was removed from their custody.
T.B.D. and C.H.D. took custody of the child for a second time in November 2002, after petitioning the trial court for custody. According to T.B.D., there are no other family members willing or able to take the child. T.B.D. testified that the mother has two sisters, both of whom are unmarried and have children. The mother also has a brother, who, according to T.B.D., does not want the child.[3] T.B.D. testified that her *Page 255 
family members have no objection to C.H.D. and her having custody of the child. T.B.D. testified that she and C.H.D. plan to adopt the child.
On appeal, the father contends that the trial court erred in terminating his parental rights. A trial court's determination of factual issues following the presentation of ore tenus evidence is presumed correct and will not be disturbed on appeal absent a showing of palpable error. F.L.L. v. State Dep't of Human Res.,612 So.2d 501 (Ala.Civ.App. 1992). Section 26-18-7, Ala. Code 1975, sets forth the statutory authority for the termination of a parent's parental rights, providing, in pertinent part:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed *Page 256 
private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
(Emphasis added.)
"A parent has a prima facie right to custody of his or her child and this right can be overcome only by clear and convincing evidence that the child's best interests would be served by permanently terminating the parent's custody." Ex parte StateDep't of Human Res., 624 So.2d 589, 591 (Ala. 1993) (citingR.C.M. v. State Dep't of Human Res., 601 So.2d 100
(Ala.Civ.App. 1991)). When the State is petitioning to terminate a parent's parental rights, the trial court must first determine if the child is dependent and then must examine whether all viable alternatives to termination have been explored. Ex parteBeasley, 564 So.2d 950 (Ala. 1990). On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. Ex parte StateDep't of Human Res., supra.
The record indicates that the father has been arrested on several occasions and, as a result of those arrests, has been incarcerated twice. At the time of trial in this matter, the father was scheduled to appear for trial in California to defend a charge of assault with a deadly weapon. The father has had very limited contact with the child and has never paid child support; the child was three years old at the time of the hearing in this matter. Although the father testified that he intended to obtain employment and rent an apartment, he had not yet executed those plans at the time of trial. Given the father's criminal arrest record, the father's impending criminal trial for assault with a deadly weapon, and the father's lack of support, both emotional and financial, of the child, we cannot say that the trial court's termination of the father's parental rights was plainly or palpably wrong. See Ex parte State Dep't of Human Res., supra.
The father also contends that the trial court erred in failing to appoint an attorney to represent his interests at the "show cause hearing" held after DHR filed its December 18, 2001, petition for immediate custody of the child. It is well settled that the "constitutional due process clause does not require the appointment of counsel for an indigent parent in dependency and temporary custody proceedings." Morgan v. Lauderdale CountyDep't of Pensions Sec., 494 So.2d 649, 651 (Ala.Civ.App. 1986) (citing Lassiter v. Department of Social Servs. of DurhamCounty, North Carolina, 452 U.S. 18, 34, 101 S.Ct. 2153,68 L.Ed.2d 640 (1981)). However, a due-process right to appointed counsel does exist for an indigent parent in termination-of-parental-rights proceedings. See K.P.B. v.D.C.A., 685 So.2d 750 (Ala.Civ.App. 1996) (holding that in Exparte Shuttleworth, 410 So.2d 896 (Ala. 1981), the supreme court found that a due-process right to appointed counsel existed for indigents in termination-of-parental-rights cases).
The trial court granted DHR's petition for immediate custody of the child on December 18, 2001. In its petition, DHR stated that the address of the father was unknown. The case action summary sheet in the record on appeal indicates that the *Page 257 
trial court set a date for a show-cause hearing but that it continued the hearing because the mother had not been served. It appears that the trial court held a hearing on March 15, 2002, at which the mother, but not the father, was present. Following the March 15, 2002, hearing, the trial court entered an order on the case action summary sheet that states: "By agreement custody continued with DHR." The father did not appeal the March 15, 2002, judgment of the trial court continuing DHR's custody of the child. The trial court then set a permanency hearing for November 15, 2002. After one failed attempt to serve the father by certified mail, the father was successfully served by certified mail on July 17, 2002, and he was notified of the November 15, 2002, permanency hearing set by the trial court. The record indicates that the father was present at the permanency hearing and that he was represented by appointed counsel at that time. The record does not indicate that the father objected at the November 15, 2002, hearing to the failure of the trial court to appoint counsel to represent him at the earlier hearings.
In Morgan, 494 So.2d 649, this court addressed a similar situation involving the trial court's failure to appoint counsel to an indigent parent in a termination-of-parental-rights proceeding. In that case, the trial court determined that the mother's children were dependent, and it placed them in the temporary custody of the Department of Pensions and Security. The trial court held three preliminary hearings on the matter, and, following the third hearing, it appointed counsel for the indigent mother. On appeal, the mother argued that the trial court erred by not appointing an attorney to represent her at any of the three preliminary hearings. However, the mother had never raised the issue before the trial court and had waited to raise the issue until she appealed the termination of her parental rights. This court affirmed the judgment of the trial court terminating the mother's parental rights. In so doing, this court held, among other things, that the trial court could not be reversed in light of the mother's failure to first raise the issue of the trial court's failure to appoint counsel to represent her at the preliminary hearings before the trial court.Morgan, 494 So.2d at 650-51.
A thorough review of the record reveals that the father did not object to the trial court's failure to appoint counsel to represent him at the March 15, 2002, hearing. Regardless, the father attended the November 15, 2002, permanency hearing and was represented by counsel at that hearing. It does not appear from the record that the father raised the issue before the trial court that he now raises on appeal. This court may not consider an issue that is raised for the first time on appeal. Andrews v.Merritt Oil Co., 612 So.2d 409 (Ala. 1992). Therefore, we will not address the merits of this issue on appeal.
AFFIRMED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result.
[1] At the time of the hearing, the mother's children, born of her marriage to C.H., had been removed from her custody.
[2] The father went to trial on the assault-with-a-deadly-weapon charge, claiming self-defense; the jury could not reach a verdict, and a new trial was scheduled for May 6, 2003. The father testified that he obtained permission to leave California for the custody hearing in Alabama.
[3] We note that the maternal grandmother filed for custody of the child in May 2002, but she later withdrew her petition for custody.