Q.F. ("the mother") appeals the termination of her parental rights to T.J.F. ("the daughter") and D.J.T. ("the son"). The trial court also terminated the parental rights of D.T., the children's father, to the children. D.T. did not appeal the trial court's judgment; therefore, this opinion does not address the facts as they pertain to him.
At the time of the August 27, 2003, hearing in this matter, the mother was 21 years old, the daughter was 15 months old, and the son was five months old. The mother has a 10th-grade education. The mother testified that she has used illegal drugs since she was 10 years old. She also testified that she had been sexually abused as a child. The mother does not have a driver's license or an automobile. She testified that she had had difficulty finding transportation to her drug-screen tests and to visitations with the children.
The mother attended several drug-treatment programs during her teens; the record does not clearly indicate the dates on which the mother attended the drug-treatment programs discussed in this paragraph. In her early teens, the mother attended a drug-treatment program she *Page 332 
referred to as "Start." After attending that drug-treatment program, the mother began using illegal drugs again. The mother's testimony indicates that at some point after her release from "Start" she was charged with assaulting her sister. As a result of that incident, the mother pleaded guilty in the Madison District Court to a charge of misdemeanor third-degree assault. As a result of her guilty plea, the mother was sentenced to 60 days in jail and two years' probation; the district court suspended the jail sentence. Also as a result of her guilty plea, the mother entered into a "drug court" program and was referred to a drug-treatment program coordinated through the Department of Youth Services ("DYS"). The mother completed the DYS drug-treatment program, but within a year she sought further treatment at "The Bridge"; she also completed that drug-treatment program.
At the time of the daughter's birth on May 21, 2002, the mother tested positive for the use of cocaine. The daughter had cocaine in her system at the time of her birth. The Madison County Department of Human Resources (hereinafter "DHR") petitioned to have the daughter declared dependent and sought custody of her. On May 24, 2002, the trial court entered an order finding the daughter dependent and awarding DHR temporary custody of the daughter; the daughter was released from the hospital into DHR's custody.
Shortly after the daughter's birth, as a condition of her initial Individualized Service Plan, developed in conjunction with DHR, the mother began drug treatment at "New Horizons." The mother did not complete the drug-treatment program at New Horizons. The mother then spent some time, apparently less than a month, in jail for violating the terms of her probation. The district court again referred the mother to a drug-treatment program within the court system, but the mother did not complete that program.
After the mother failed to complete the New Horizons and the second court-ordered drug-treatment programs, Paige Norton, a DHR social worker who worked on this case from the time of the daughter's birth until January 2003, referred the mother to an inpatient drug-treatment facility in Memphis, Tennessee, known as "Synergy." The mother attended Synergy's drug-treatment program from August 27, 2002, through November 1, 2002. Norton testified that the counselor at Synergy reported that the mother was asked to leave the program after the mother had had sexual relations with another patient; the mother testified that she did not recall doing that.
Norton then referred the mother to "Alethia House" for inpatient treatment. The counselors at Alethia House gave the mother a "pass" on February 14, 2003, so that she could attend a review hearing regarding the daughter. The mother did not return to Alethia House after that hearing, and she was subsequently discharged from Alethia House's drug-treatment program. The mother explained her failure to return to the drug-treatment program by stating, "I just got hard-headed and did not want to go [back]."
After the mother left Alethia House on February 14, 2003, she did not contact DHR social workers for a month and a half. On March 31, 2003, the mother gave birth to the son. The mother had used an alias when she checked into the hospital for the birth of the son. At the time of the son's birth, the mother tested positive for the use of both marijuana and cocaine; the son had those drugs in his system, and he tested positive for syphilis. The hospital administration alerted DHR, and DHR social workers discovered the mother's identity. *Page 333 
On April 4, 2003, the trial court entered an order that allowed the son to be released from the hospital into DHR's custody.
On June 4, 2003, DHR filed a petition seeking to terminate the mother's and the father's parental rights to the two children. In its petition, DHR alleged that the parents were unwilling or unable to discharge their parental responsibilities and that their conditions were not likely to change in the foreseeable future.
At the August 27, 2003, termination hearing, Latoya Jenkins, the social worker who replaced Norton as the social worker on this case in January 2003, testified regarding the services DHR had provided to the mother. Those services included drug treatment and transportation. Jenkins also testified that the mother did not comply with any of her four requests that the mother take a drug-screen test. The mother stated that she did not have transportation for two of those requested drug-screen tests. However, Jenkins testified that she could have provided the mother transportation but that the mother did not inform her that she did not have transportation until 24 hours after she had been asked to submit to the drug-screen tests. Jenkins testified that after the mother left Alethia House, the mother did not ask for any additional referrals to a drug-treatment program. Jenkins also stated that, based on the mother's history and her failure to comply with the drug-screen requests, Jenkins assumed that the mother was not interested in attending another drug-treatment program.
The mother was inconsistent in visiting the children. It is not clear from the record exactly how many visits with the children the mother had missed. The mother missed all her scheduled visits during the one and a half months between the time that the she left Alethia House and the date that she gave birth to the son. The mother testified that she had occasionally asked DHR for transportation to visitation and that on two occasions the requested transportation did not arrive. Jenkins testified that several times the mother called to request transportation at the time the visitation was scheduled to begin; at that point, Jenkins stated, it was too late for DHR to arrange transportation for the mother. Jenkins also testified that on several occasions when the mother had properly requested transportation to drug-screen tests or to visitations with the children the mother had not been at home when the arranged transportation arrived to pick her up.
Jenkins testified that DHR had investigated the relatives that the mother had named as possible relative resources for the children. Those relatives were either unwilling to take the children or were deemed not to be suitable placements for the children. For example, the maternal grandmother was willing to take the children, but her son, the mother's brother, was in DHR custody. At the termination hearing, the mother testified that, other than the relatives she had already identified, there were no other possible relative resources for the children.
The mother has never had custody of the daughter or the son. At the time of the termination hearing, the mother was in jail for violating the terms of her probation, but she was transported to the hearing. Also at that time, the mother had been charged with assault; the confrontation that precipitated that charge had occurred only a couple of weeks before the August 27, 2003, termination hearing. At the termination hearing, the mother claimed that she would soon be out of jail on a bond. She admitted, however, that the new assault charge was pending against her. *Page 334 
The mother testified that she had last used cocaine three months before the termination hearing and that she had used marijuana approximately one month before the termination hearing. The mother testified that her family often provided her with drugs and that she was willing to leave the Madison County area in order to avoid her family and regain custody of her children.
The mother testified that she planned to find a job and that she would "find a way" to obtain transportation to that job and to arrange for day care for the children while she was working. The mother admitted that, at the time of the termination hearing, she was not capable of providing for her children and that she had not attempted to provide them any financial support during the time they had been in DHR's custody.
On appeal, the mother argues that the trial court erred in terminating her parental rights. Section 26-18-7, Ala. Code 1975, sets forth the statutory authority for the termination of parental rights. That section provides, in pertinent part:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition *Page 335 
to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
Where a trial court receives ore tenus evidence in a termination-of-parental-rights case, the trial court's judgment based on that evidence is presumed correct and will not be overturned absent a showing that the judgment is plainly and palpably wrong. S.B.L. v. Cleburne County Dep't of Human Res.,881 So.2d 1029 (Ala.Civ.App. 2003).
 "`A parent has a prima facie right to custody of his or her child and this right can be overcome only by clear and convincing evidence that the child's best interests would be served by permanently terminating the parent's custody.' Ex parte State Dep't of Human Res., 624 So.2d 589, 591 (Ala. 1993) (citing R.C.M. v. State Dep't of Human Res., 601 So.2d 100
(Ala.Civ.App. 1991)). When the State is petitioning to terminate a parent's parental rights, the trial court must first determine if the child is dependent and then must examine whether all viable alternatives to termination have been explored. Ex parte Beasley, 564 So.2d 950 (Ala. 1990). On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. Ex parte State Dep't of Human Res., supra."
W.C. v. State Dep't of Human Res., 887 So.2d 251, 256
(Ala.Civ.App. 2003). The paramount consideration in a case involving the termination of parental rights is the best interests of the children. S.B.L. v. Cleburne County Dep't ofHuman Res., supra; J.L. v. State Dep't of Human Res.,688 So.2d 868, 869 (Ala.Civ.App. 1997).
In her brief on appeal, the mother argues that there was not "clear and convincing" evidence on which the trial court could rely in deciding to terminate her parental rights. See §26-18-7(a), Ala. Code 1975. She also contends that DHR did not provide services to her that would have allowed her to become better able to care for her children.
The mother contends that DHR should have referred her to another drug-treatment program after she left the Alethia House program. However, after she left Alethia House, the mother failed to contact DHR social workers; DHR discovered her whereabouts only after the hospital notified DHR that the mother, who had entered the hospital under an alias, had tested positive for the use of illegal drugs at the time of the son's birth. After the son's birth, the mother did not comply with Jenkins's requests that she submit to drug-screen tests, and she did not ask for a referral to another drug-treatment program. *Page 336 
The record indicates that the mother has attended numerous drug-treatment programs, that the mother left most of those programs without completing them, and that the mother has consistently returned to using illegal drugs. The mother does not even assert in her brief on appeal that she wanted to attend another drug-treatment program or that she would have completed or complied with another program; she did not testify at the hearing that she wanted additional treatment. Given the mother's treatment history and her failure to ask for any additional addiction treatment from DHR, it does not seem reasonable to require DHR to continue to refer the mother to, and pay for, additional drug-treatment programs.
The mother's argument that DHR failed to assist her with reunification with her children because it failed to provide her transportation is also unpersuasive. The evidence indicated that the mother sometimes failed to request transportation, that she occasionally asked for transportation at the last minute, and that she sometimes was not home when transportation was provided. Jenkins testified that DHR would arrange transportation for the mother when she requested it. We cannot require DHR to schedule transportation in anticipation of a parent's needs or to consistently reschedule visitation when a parent's transportation "falls through," as the mother's did on a regular basis. At some point, the responsibility to anticipate the need for transportation and to make a timely request to DHR for that transportation becomes the parent's burden; the mother's failure to accept that responsibility indicates her unwillingness or inability to make efforts to regain custody of her children. Also, the mother suggests in her brief on appeal that drug-screen tests should be rescheduled when a parent fails to request transportation to those tests; however, doing so would defeat the purpose behind the random testing for illegal drugs.
The mother was not employed at the time of the termination hearing. She gave only a vague assertion that, if the children were returned to her, she would "find a way" to find and maintain employment and arrange for child care. However, the record does not indicate that the mother has been able to maintain employment during the time the children have been out of her custody.
At the time of the termination hearing, the mother was in jail for violating her probation, and she had an assault charge pending against her. Although the mother testified that she expected to be out of jail shortly after the termination hearing, there existed the possibility of the mother spending additional time in jail.
In its judgment, the trial court found, among other things, that DHR had made reasonable efforts, including offering the mother a number of opportunities to participate in drug-treatment programs, to reunify the mother and the children. The trial court also found that the mother was unable or unwilling to discharge her parental responsibilities and that her situation was unlikely to change in the foreseeable future. Those factors are among the factors the trial court was required to consider, pursuant to §26-18-7, Ala. Code 1975, in deciding whether to terminate the mother's parental rights. Our review of the record indicates that there was substantial evidence to support the trial court's findings and its decision to terminate the mother's parental rights. W.C. v. State Dep't of Human Res., supra.
The mother does not argue in her brief on appeal that there were any viable alternatives to the termination of her parental rights. As previously noted, the record indicates that there were no relatives willing *Page 337 
or suitable to take custody of the children.
We conclude that the trial court's judgment is supported by the evidence in the record.
AFFIRMED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result, without writing.