T.B. ("the father") appeals from a judgment terminating his parental rights to J.P. ("the child"). The trial court also terminated the parental rights of C.P., the child's mother. C.P. did not appeal the trial court's judgment; therefore, this opinion does not address in detail the facts as they pertain to C.P.[1]
At the time of the December 9, 2004, hearing in this matter, the child was 17 years old. The child had been in the custody of the Department of Human Resources ("DHR") for four years. The father and C.P. were both incarcerated at the time of the hearing. The father had been convicted of distributing a controlled substance and was serving a three-year sentence; he was due to be released from prison in 2007. C.P. had been imprisoned for attempting to murder her girlfriend; the record does not reveal when C.P. was due to be released from prison.
DHR first became involved with C.P. and the child in June 1999 when it received a child-abuse and neglect report concerning the child. DHR immediately opened a protective-services case on the family. In August 2000, DHR petitioned to remove the child from C.P.'s custody after learning that C.P. had shot her girlfriend; the trial court found the child to be dependent and awarded custody of the child to DHR. On April 9, 2003, DHR petitioned to terminate the father's parental rights to the child. In its petition, DHR alleged, among other things, that the father had failed to provide appropriate care and supervision for the child and that the father was unable to discharge his parental responsibilities.
At the termination hearing, Katherine Linville, the DHR protective-services supervisor assigned to the child's case in or about June 1999, testified that C.P. had *Page 567 
not been forthcoming with relative placements for the child. According to Linville, C.P. knew the identity of the child's father but did not know his location or how to contact him. The record indicates that the father had not been involved in the child's life. Linville testified that the child had been diagnosed with bipolar disorder and, as a result, had been placed in a therapeutic foster home. Linville testified that the child had remained in the same foster home for the past four years.
The record indicates that DHR located the father after the child was removed from C.P.'s custody and placed in the custody of DHR. Laura Sneed, a DHR employee first assigned to the case in August 2000, testified that she evaluated the father with regard to placement for the child. Sneed testified that she visited the father and his wife at their home. According to Sneed, three other children were living in the home at the time. Sneed testified that the father was not a favorable placement because of his criminal history. Sneed further testified that she had concerns regarding the father's financial ability to care for the child. Sneed testified that the father exercised visitation with the child over an approximate six- to nine-month time frame. According to Sneed, the father initially visited the child at DHR's office and later visited the child outside of DHR's office at a local park while the child was playing baseball. Sneed testified that she observed the visits at the DHR office and that, during those visits, the father's wife, rather than the father, communicated with the child the majority of the time. Sneed testified that in July 2002 the father ended his contact with the child without an explanation. Sneed testified that she had not had contact with the father in two years.
Sneed testified that the father's incarceration renders him an unsuitable placement for the child. According to Sneed, the only alternative is to terminate the father's parental rights, which, she stated, would provide emotional benefits to the child. Sneed testified that the child has expressed a desire to have his parents' parental rights terminated. Sneed testified that the child had declined to visit the father in prison.
At the time of the hearing in this matter, the child was in his sophomore year of high school. According to Sneed, the child is not ready to be on his own; the child has no driver's license and no steady employment. Sneed testified that the child can remain in foster care through DHR until he reaches 21 years of age. Sneed noted that, at the time of trial, the child participated in DHR's "independent living program." Sneed testified that, in addition to the program through DHR, the child also received help from his foster parents who helped him learn to budget money and to generally prepare for life once he enrolls in college. According to Sneed, the child had adjusted well to living with his foster parents.
The father testified that he had been convicted of distributing a controlled substance; the record does not reveal the date of his conviction. He was sentenced to 20 years imprisonment; that sentence was split, and he was ordered to serve 3 years in prison followed by 3 years supervised probation. This was the father's second conviction; he had previously been imprisoned for burglary. The father participates in a work-release program in prison in which he is employed by a lumbar company. The father testified that he is scheduled to be released from prison in 2007.
The father has a high-school education; otherwise he has no special training or skills. The father testified that he is physically disabled as a result of five back surgeries. The father testified that child-support *Page 568 
payments are automatically deducted from his "check." It is unclear from the record if the "check" the father refers to is payment for his participation in the prison work-release program or payment from the government relating to his disability. The father admitted that when he was not in prison he failed to pay child support in a timely manner and that, as a result, he owes a child-support arrearage. The exact amount of the father's child-support arrearage at the time of trial was unknown. According to the father, he fell behind on his child-support payments because of his disability.
The father testified that he regularly visited with the child twice a week after the child was placed in foster care. According to the father, he had no interaction with the child before the child was placed in foster care because C.P. would not permit it. There is no indication in the record that the father ever took legal action to petition for visitation with the child before the child was placed in DHR's custody. The father testified that he only stopped visiting the child after he was incarcerated. The father acknowledged that he last spoke to the child two years before trial. The father represented to the trial court that he is willing to provide care and support for the child as soon as he is released from prison.
On appeal, the father contends that the trial court erred when it denied his motion to dismiss DHR's petition to terminate his parental rights. In that motion, the father asserted that the petition failed to allege that DHR was willing to assume custody of the child pursuant to § 26-18-4, Ala. Code 1975. Section26-18-4, in pertinent part, provides: "No complaint or petition shall be filed by any party unless it alleges that the party filing the same . . . is able and willing to assume custody of said child, and no such petition shall be granted except upon proof of such allegations." According to the father, DHR was required to allege in its petition that it was willing to assume custody of the child because, he argues, the record gives no indication that the trial court had continuing jurisdiction over the child by virtue of having found the child to be dependent.
In Carter v. Griffin, 574 So.2d 800 (Ala.Civ.App. 1990), the maternal grandparents moved to terminate the father's parental rights to their grandchild of whom they had received temporary custody by an order of the trial court entered before they petitioned to terminate the parental rights of the father. The trial court terminated the father's parental rights. On appeal, the father challenged the jurisdiction of the trial court to terminate his parental rights given the failure of the maternal grandparents to allege in their termination petition that they were "able and willing to assume custody" pursuant to § 26-18-4.Carter, 574 So.2d at 801. This court affirmed the judgment of the trial court, relying on Valero v. State Department of HumanResources, 511 So.2d 200 (Ala.Civ.App. 1987), for the proposition that, where the jurisdiction of the trial court has been invoked by earlier proceedings of a related matter, such jurisdiction continues until the child reaches 21 years of age or is discharged by the trial court. Id.
Contrary to the father's contention on appeal, the failure of DHR to assert that it was "able and willing" to assume custody of the child in its petition to terminate parental rights does not render the trial court without jurisdiction and thus mandate dismissal as the father claims. The record clearly reveals that the trial court had found the child to be dependent when it awarded temporary legal custody of the child to DHR in August 2000. The trial court noted its earlier finding of dependency in its judgment terminating the *Page 569 
father's parental rights. Therefore, the trial court continued to have jurisdiction over the child, and the lack of specific allegations that DHR was "able and willing" to assume custody of the child did not warrant the dismissal of the petition to terminate the father's parental rights.
The father also contends that the trial court erred by terminating his parental rights. Specifically, the father argues that DHR failed to prove by clear and convincing evidence that the child's best interest would be served by terminating his parental rights. Section 26-18-7, Ala. Code 1975, sets out the statutory grounds for terminating parental rights:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by [DHR] or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed *Page 570 
private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
Where a trial court receives ore tenus evidence in a termination-of-parental-rights case, the trial court's judgment based on that evidence is presumed correct and will not be overturned absent a showing that the judgment is plainly and palpably wrong. Q.F. v. Madison County Dep't of Human Res.,891 So.2d 330 (Ala.Civ.App. 2004); S.B.L. v. Cleburne County Dep'tof Human Res., 881 So.2d 1029 (Ala.Civ.App. 2003). When the State is petitioning to terminate a parent's parental rights, the trial court must first determine if the child is dependent and then must examine whether all viable alternatives to termination have been considered. Ex parte Beasley, 564 So.2d 950, 954-55
(Ala. 1990). See also Q.F. v. Madison County Dep't of HumanRes., supra. In deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions. Ex parte State Dep'tof Human Res., 624 So.2d 589, 593 (Ala. 1993). The paramount consideration in termination proceedings is the best interests of the child. Ex parte J.R., 896 So.2d 416 (Ala. 2004); V.O. v.State Dep't of Human Res., 876 So.2d 1151 (Ala. 2003). In determining the best interests of the child, the trial court must consider whether the parents are physically, financially, and mentally able to provide for the child. V.O. v. State Dep't ofHuman Res., supra.
The record in this case indicates that the child had been in the custody of DHR for four years. At the time of trial, the child was 17 years old. After the child was placed in the custody of DHR, the father exercised visitation with the child. However, the father stopped visiting the child without explanation in July 2002. It is unclear from the record if, at the time the father stopped visiting the child, he was incarcerated and awaiting trial on drug charges, or if he had not yet been arrested on those charges. Nevertheless, at the time of trial, the father had had no contact with the child for two years. The father acknowledged that he was unable to take physical custody of the child because of his imprisonment. The father was incarcerated at the time of trial with the majority of his three-year sentence left to serve; he is due to be released from prison in 2007. The father's inability to care for the child is not likely to change in the foreseeable future. The child will be approximately 20 years old when the father is released from prison.
The child has been diagnosed with bipolar disorder. The child lives in the same therapeutic foster home that he has lived in since being placed in DHR's custody in August 2000. The record indicates that the child is excelling in that placement. The child attends high school and participates in a DHR sponsored program that prepares him to live on his own. The trial court was presented with testimony revealing the child's desire to remain in his foster-care placement. Testimony presented at trial also indicated that the child did not desire to continue his relationship with the father and in fact desired to have his parents' parental rights terminated. The child has not communicated with the father during the father's incarceration. *Page 571 
In light of the foregoing, we cannot say that the trial court erred in finding that termination of the father's parental rights was in the best interests of the child.
AFFIRMED.
CRAWLEY, P.J., and THOMPSON, PITTMAN, and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result, without opinion.
[1] At trial, the trial court heard testimony relating to D.L., the father of another child born to C.P. The trial court received exhibits into evidence relating to D.L. and C.P. that were not included in the record on appeal. However, a review of the transcript of the proceedings at trial indicates that those exhibits have no bearing on the issue this court is called upon to review, namely, the termination of the father's parental rights.