DONALDSON, Judge.
The Talladega County Department of Human Resources (“DHR”) appeals from a judgment of the Talladega Juvenile Court (“the juvenile court”) denying its pétition to terminate the parental' rights of J.J. (“the father”) and N.J. (“the mother”) to their child, S.J. (“the child”). We affirm the juvenile court’s judgment.

Facts and Procedural History,

On November 1, 2013, DHR-filed a petition in the juvenile court to terminate the parental rights of the father and the mother to the child. On the same day, the juvenile court appointed.a guardian ad li-tem to represent the interests of the child. The mother and the father were represented by separate counsel. The juvenile court held a trial on April 2, 2014. The record contains the following facts relevant to the issues presented for review.
The child, born in May 2001, has been diagnosed with .autism and requires constant supervision. At some point not specifically indicated in the record but likely around 2009, the mother was convicted in Tennessee on charges related to sexual abuse of the child. The record does not establish whether the offense was a felony. At the time of trial, the mother remained incarcerated in Tennessee. Jennifer Ponder, a DHR caseworker, testified that the mother was expected to be released from prison in November 2016, although other witnesses testified that the mother would be released in 2020 or .at some later point in time.
The father is unemployed and disabled. He suffers from multiple debilitating illnesses and infirmities, including type II diabetes, arthritis, high blood pressure, high cholesterol, and back pain due to 18 ruptured disks. He has suffered eight heart attacks and three strokes. ' He has had three back surgeries and two hydro-cele-cyst operations. He testified that he was undergoing tests to see if he would require cardiac surgery. He testified that he was under the care of 6 different physicians and. that he takes 30 prescription medications per day. He is confined to a wheelchair.
In December 2010, DHR received a report from the child’s school that the child had bruises on her back. Lewis Prince, a DHR caseworker, testified that DHR concluded that the bruises were not caused .by an accident but that “they had to have been inflicted [by someone] other than herself.” Prince testified, however, that DHR could not determine if the bruises were caused by the father. The father denied that he had abused the child,. Prince testified that he went to the father’s home and found it to be unclean. Prince found that the father was unable to meet the special needs of the child and that the child was having trouble in school. DHR petitioned for and received custody of the child in December 2010 and placed the child in foster care in a therapeutic foster home. The father continued to have unsupervised overnight visitation with the child after December 2010, although the father had a caregiver, his paramour, in the home at the time to assist with caring for the child.
Prince testified that DHR provided services to the father. He stated that the *708 father had completed parenting classes and that DHR had provided him with counseling, including providing him with two in-home case aides who instructed him about caring for the child, how to discipline the child appropriately, and how to provide a clean home. Prince testified that the father yelled and screamed and cursed at the child “quite often” when DHR first became involved with the family, including in front of Prince. He testified that dealing with the child requires patience, consistency, care, and firm direction without agitation. He testified that DHR worked with the father on issues relating to anger management and proper discipline of the child. He testified that the father’s physical disabilities prevented him from providing adequate care and supervision for the child.
Prince testified that the father maintained regular visits with the child up until the time he stopped working on the case in March 2013. Prince testified that the child enjoyed the visits with the father and that the child appeared to have an emotional attachment to the father. Under cross-examination from the guardian ad litem, Prince stated:
“Q. Did it appear to you that [the child] had an emotional attachment to her father?
“A. Yes, sir.
“Q., What made you feel that way?
“A. Her reaction to her dad. If you said I’m going to get to see dad, she was very excited. Always wanted to see him up until the last time I participated in the visit, she wanted to see her dad. It got to the point where she wanted to see her dad, loved her dad, as far as I know still does, was attached to him, but it got to the point where the attachment was not so much. She was ready to go home, she was ready to- go home, and to her home had become somewhere else. She loved seeing her dad, wanted to visit with him, but after just a time, she was ready to go.”
Prince testified that the child’s condition had improved since being placed in foster care. He testified that he never believed that it was in the child’s best interest not to have visitation with her father.
• Ponder testified that she began working on the case in March 2013. She testified that the child was enrolled in school, that she was in the 7th grade, that she had an IQ between 40 and , 55, that she was being provided special-education services, and that she functioned at the level of a three to five year old. Ponder testified that DHR had not identified an adoptive resource for the child in the event the juvenile court granted its petition to terminate the parents’ parental rights. Ponder testified that DHR’s primary concerns regarding the father’s ability to parent were that he was unable to maintain a stable home, that-he had health issues that prevented him from properly caring for and supervising the child, that his home environment had been unclean, and that he allowed paramours to live in his home. Nicole Parker, a DHR supervisor, testified that DHR had attempted to locate relative resources but that none were determined to be suitable.
The father testified that his health had deteriorated since the child had been placed in foster care. He' testified that he had lived in six different residences since 2010. He testified that, in June 2013, he moved into his mother’s residence in Dale-ville to care for her and to spend time with her because she had become gravely ill. The father testified that his mother passed away a few days before trial. He testified that, after his mother’s death, he relocated to a relative’s home in Five Points, where he was living temporarily. He said that he had located a trailer in Five Points that he *709 planned on renting and moving into at some point after the trial. He testified that he had a nurse and/or a caretaker that came to his house three days a week to clean, cook, and perform other household chores. He denied that he yelled and screamed at the child, and he denied being physically abusive toward her. The father testified that he last visited the child in May 2013 because he had moved to Dale-ville to be with his sick mother. Additionally, he testified that he had had his third stroke in late June 2013. The father testified that he had been unable to travel to visit with the child because the stroke had rendered him bedridden and his medications had made him weak. The father testified that he had spoken with the child by telephone at least once a month when he was living in Daleville. He testified that he was unable to call more frequently because he had a limited number of minutes on his phone and because the foster mother told him that the child would get overly excited when he would call. He also stated that he was unable to write letters to the child because he could not hold his hands steady enough due to his illnesses. He said that he last spoke to the child by telephone on Christmas Day 2013. He said that he had recently recovered enough to return to Sylacauga. He testified that he owned a car but that he did not have a valid driver’s license and that he did not have liability insurance on the vehicle.
At the conclusion of the trial, the guardian ad litem recommended that the juvenile court grant DHR’s petition as to the mother but deny the petition as to the father because of the evidence indicating the existence of an emotional bond between the father and the child. On May 28, 2014, the juvenile court entered a judgment denying DHR’s petition as to both parents, stating in part:
■ “After consideration of the testimony ' regarding the termination of the parental rights of the above named minor child and the report of the Guardian Ad Litem to this Court[,] the Court feels that it is taking a big gamble that this child will be adopted and cannot make a finding that the Termination of Parental Rights is in the best interest of said minor child at this time without an identified person wanting to adopt. The Child has a strong possibility of being a legal orphan for her life, the Court is of the opinion that this possible consequence would be severely detrimental to the minor child and that the Court cannot conclude it is in the child[’]s best interest to Terminate the Parental Rights of the parents.
“Further the Court understands that the father’s past sporadic visitation were due to caring for his now deceased mother. The Court expects the father to be consistent with his visitation but if his visitation becomes sporadic again the Court is of the opinion that another Petition to Terminate Parental Rights is to be filed.”
DHR filed a motion to alter, amend, or vacate the judgment on June 11, 2014. The juvenile court held a hearing on that motion on June 18, 2014. At that hearing, the juvenile court explained that its reasoning for denying DHR’s petition was not solely because an adoptive resource for the child had not been identified. The juvenile court stated in open court that it “had a difficult time believing that it would harm the child” by allowing the father and the child to continue their relationship through visitation, which had been interrupted when the father left to care for his dying mother, and that it would be in the child’s best interest to maintain that relationship. DHR’s postjudgment motion was denied by operation of law on June 25, 2014.
*710 ■DHR filed a timely notice of appeal to this court on July 2, 2014.[1] The father and the mother have each filed a brief in opposition to DHR’s appellate brief. The child, through her guardian ad litem, has also filed a brief as an “appellee,” and her arguments aligned with those of the father.

Discussion

DHR contends that it presented clear and convincing evidence establishing that the father’s and the mother’s parental rights were due to be terminated. DHR argues that the juvenile court erred by denying DHR’s petition On the basis that DHR had not identified an adoptive resource for the child.
“The juvenile court’s judgment based on ... ore tenus evidence is presumed to be correct and will not be overturned absent a showing that the judgment is plainly and palpably wrong. S.B.L. v. Cleburne County Dep’t of Human Res., 881 So.2d 1029, 1031-32 (Ala.Civ.App. 2003).
“ ‘ “A parent has a prima facie right to custody of his or her child and this right can be overcome only by clear and convincing evidence that the child’s best interests would be served by permanently terminating the parent’s custody.” Ex parte State Dep’t of Human Res., 624 So.2d 589, 591 (Ala.1993) (citing R.C.M. v. State Dep’t of Human Res., 601 So.2d 100 (Ala.Civ.App.1991)). When the' State - is petitioning to terminate a parent’s parental rights, the trial court must first determine if the child is dependent and then must examine whether ■ all viable alternatives to termination have been explored. Ex parte Beasley, 564 So.2d 950 (Ala.1990). On appeal, the trial court’s determination is *711 presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. Ex parte State Dep’t of Huqman Res., supra.’
“W.C. v. State Dep’t of Human Res., 887 So.2d 251, 256 (Ala.Civ.App.2008). The paramount consideration in a case involving the termination of parental, rights is the best interests of the children. Q.F. v. Madison County Dep’t of Human Res., 891 So.2d 330, 335 (Ala. Civ.App.2004); S.B.L. v. Cleburne County Dep’t of Human Res., 881 So.2d at 1032; and J.L. v. State Dep’t of Human Res., 688 So.2d 868, 869 (Ala.Civ.App. 1997).”
C.T. v. Calhoun Cnty. Dep’t of Human Res., 8 So.3d 984, 987 (Ala.Civ.App.2008).
In its judgment, the juvenile court did not make an explicit finding of dependency. Pursuant to -the first prong of the test announced by our supreme court in Ex parte Beasley, 564 So.2d 950 (Ala.1990), the juvenile court must determine from clear and convincing evidence that the child is dependent. ■ Only after making that determination can .the juvenile court proceed to the second prong of the Beasley test, e.g., determining whether viable alternatives to termination of parental rights exist. In its judgment, the juvenile court focused primarily on the second prong of the test in concluding that viable alternatives to terminating the parental rights existed. We conclude that, in order to have reached the second prong of the Beasley test, the. juvenile court impliedly found that clear and. convincing evidence established that the child was dependent. In J.P. v. S.S., 989 So.2d 591 (Ala.Civ.App. 2008), this court held
“that when the evidence in the record supports a finding of dependency and when the trial court has made a disposition consistent with a finding of dependency, in the interest of judicial economy this court may hold that a finding of dependency is implicit in the trial court’s judgment.”
989 So.2d at 598 (citing L.L.M. v. S.F., 919 So.2d 307, 311 (Ala.Civ.App.2005), O.L.D. v. J.C., 769 So.2d 299, 302 (Ala.Civ.App. 1999), and A.J.J. v. J.L., 752 So.2d 499, 503 (Ala.Civ.App.1999)).
In order for the juvenile court to make a finding that a child is dependent in a case involving termination • of parental rights, the juvenile court fnust first determine by clear and convincing evidence that grounds for termination of parental rights exist. Beasley, 564 So.2d at 954. Pursuant to § 12-15-319(a), Ala.Code 1975, grounds exist for a juvenile court to terminate the parents’ parental rights when the parents are “unable or unwilling, to discharge their responsibilities to and for the child, or [when] the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future_” The'factors for the juvenile court to consider when determining whether to terminate parental rights are set out in § 12-15-319(a), including the following:
[[Image here]]
“(3) That, the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child_
“(4) Conviction of and imprisonment for a felony.
[[Image here]]
“(6) Unexplained serious physical injury to the child under those circumstances as would indicate that the injuries ■ resulted from the intentional conduct or willful neglect of the parent.
*712 “(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the-parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
A determination that the father lacks the ability to meet the special needs of the child is supported by clear and convincing evidence in the record. The father admitted that he had lived at multiple residences since 2010. The evidence indicates that he struggled to maintain a clean household without the assistance of caregivers. Substantial evidence established that the father has multiple health issues that render him disabled and that prevent him from being able to provide the proper care for the special needs of the child. Ample testimony was presented to show that the child has been diagnosed with autism and that her behavior requires a constant need for supervision. Because she has an IQ between 40 and 55, the child attends special-education classes. ■ Thus, the implicit findings by the juvenile court that the child is- dependent and that grounds exist to terminate the father’s parental rights are supported by clear and convincing evidence.
DHR argues that it presented clear and convincing evidence that there were no viable alternatives to termination of the father’s parental rights and that the juvenile court improperly denied the petition on the basis that DHR had not identified an adoptive resource. “Pursuant to Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990), after it has been determined that the child is dependent, a juvenile court is then required to determine whether there exists a viable alternative to the termination of parental rights.” Montgomery Cnty. Dep’t of Human Res. v. W.J., 34 So.3d 686, 691 (Ala.Civ.App.2009).
“[P]arental rights may not be terminated, even if sufficient statutory grounds exist, when some less drastic measure might be employed to preserve the parental relationship without harming the interests of the child. See Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).
“‘Parents and their children share ■ a fundamental right to family integrity that does not dissolve simply because the parents have not been model parents. Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). That due-process right requires states to use the most narrowly tailored means of achieving the state’s goal of protecting children from parental harm. Roe v. Conn, 417 F.Supp. 769, 779 (M.D.Ala.1976). Thus, if some less drastic alternative > to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights. Id’
*713 “T.D.K. v. L.A.W., 78 So.3d 1006, 1011 (Ala.Civ.App.2011).”
B.A.M. v. Cullman Cnty. Dep’t of Human Res., 150 So.3d 782, 785 (Ala.Civ.App. 2014).
This court has held that, although the lack of an adoptive resource may serve as a factor that a juvenile court may consider when determining whether termination of parental rights would not be m the best interests' of a child, there is no requirement that DHR identify an adoptive resource before parental'rights can be terminated. R.B. v. State Dep’t of Human Res., 669 So.2d 187, 191 (Ala.Civ.App. 1995). See also T.L.S. v. Lauderdale Cnty. Dep’t of Human Res., 119 So.3d 431, 439 (Ala.Civ.App.2013).- Stated otherwise, a juvenile court’s refusal to terminate parental rights based solely upon the lack of an identifiable adoptive resource could constitute reversible error. However, this court has also recognized that consideration of the. status quo is appropriate when uncertainty exists regarding permanency for a special-needs child and when termination of parental rights could result in emotional turmoil for that child. See B.A.M., supra, and C.M. v. Tuscaloosa Cnty. Dep’t of Human Res., 81 So.3d 391, 398 (Ala.Civ.App.2011)(reversing a judgment terminating parental rights because evidence indicated that maintaining visitation was in the' best interests of the child).
In the present case, substantial evidence presented at trial indicates that there exists a strong emotional bond between the father and the child. Although Prince testified that the child had unexplained injuries in December 2010, he further testified that DHR could not establish that the father caused the injuries. The juvenile court could have been unconvinced that the father was responsible for the injuries and, instead, could have believed the father’s assertion that he did not physically abuse the child. The undisputed evidence shows that the child loves the father and that she enjoys visiting with the father. Although the father had not visited with the child in over a year, the juvenile court could have determined, that his health issues precluded him from traveling from Daleville to visit her. The transcript of the proceedings conducted on DHR’s postjudgment motion-shows that the. juvenile court “had a difficult time believing that it would harm the child” by allowing the father and the. child, to continue with visitation that had been interrupted when the father left to take care of his dying mother. The juvenile court’s determination that maintaining visitation with the father is in the , child’s best interest is supported by, the evidence.
Furthermore, the evidence indicates that- DHR had not identified an adoptive resource for the child at the time of the termination hearing and that the child would be added to the State’s adoption registry. The child has special needs. She has been subjected to abuse in the past. DHR placed the’ child in a therapeutic foster home. Ponder, the DHR caseworker, testified that DHR would need to locate an adoptive -resource that could cater to the special needs of the child. Ponder testified that “[i]f there is no [adoptive] home available, [the child] will remain where she is [in foster care], and [DHR] will continue.. to search for an . adoptive home.” As we noted in CM.,
“[b]ecause -of the -uncertainty regarding . the [child’s] prospects for adoption, we conclude that the record does not contain-clear and convincing evidence indicating that the [child] would achieve permanency if the [father’s] parental rights were terminated. Accordingly, the desire for permanency in this case cannot ..override the- clear and convincing evidence indicating that maintaining visita *714 tion with the [father] is in the [child’s] best interests.”
81 So.3d at 398.
Section '12-15-319 provides that if the required findings are made, the juvenile court “may” terminate parental rights. The term “may”- leaves the decision to the discretion of the juvenile court. See Ex parte Mobile Cnty. Bd. of Sch. Comm’rs, 61 So.3d 292, 294 (Ala.Civ.App.2010)(“Ordi-narily, the use of the word ‘may’ indicates a discretionary or permissive act, rather than a mandatory -act.”). Furthermore, “[w]hen evidence is presented ore tenus, it is the duty of the trial court, which had the opportunity to observe the witnesses and their demeanors,- and not the appellate court, to make credibility determinations and to weigh the evidence presented.” Ex parte Hayes, 70 So.3d 1211, 1215 (Ala.2011)(citing Blackman v. Gray Rider Truck Lines, Inc., 716 So,2d 698, 700 (Ala. Civ.App.1998)). For the foregoing reasons, we conclude that the juvenile court could have determined from the evidence that termination of the father’s parental rights is not in the best interests of the child.
We further noté that DHR’s petition as it related to the mother was only minimally addressed in the evidence presented by DHR at trial, and the judgment of the juvenile court does not specifically address any issue regarding the mother. A vast majority of the testimony and evidence presented to the juvenile court was directed toward DHR’s petition to terminate the father’s parental rights. In . its brief, DHR contends that grounds existed to terminate the mother’s parental rights only because she has been convicted of and imprisoned for' a felony. See § 12-15-319(a)(4). Although the testimony indicated that the mother was incarcerated in Tennessee for sexually abusing the child, there is nothing in the record from which the trial court could have been clearly convinced that the mother has been convicted of. a felony. No records from the criminal proceedings in Tennessee were introduced into evidence. As the petitioner, DHR had the burden of proving by clear and convincing evidence that grounds for terminating the mother’s parental rights existed. DHR only. produced evidence- showing that the mother has been convicted and imprisoned, but it did not show that the offense was, a felony. Therefore, we are compelled to, hold that the juvenile court did not err in declining to terminate the mother’s parental rights.

Conclusion-

For the foregoing reasons, we affirm the juvenile court’s judgment denying DHR’s petition to terminate the father’s and the mother’s parental rights to the child.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, jj., concur.

. DHR initially failed to serve its. brief on appeal and its reply brief on appeal on the ' mother. On March 23, 2015, this court sent an order to the parties notifying them of the deficiency, see Rule 2(a), Ala. R.App. P.> and requesting letter briefs regarding the status of DHR’s appeal of the portion of the judgment refusing to terminate the mother’s parental rights. In its letter brief, DHR- informed this court that the mother's trial counsel, who was listed in the certificate of service on DHR’s ■ notice of appeal to this court, became employed by. DHR in- January 2015. DHR stated that the mother’s trial attorney filed a motion to withdraw in the juvenile court on March 28, 2015, which the juvenile court purportedly granted on March 30, 2015. DHR, the ■ father, and the guardian ad litem submitted a joint motion requesting that this court reinvest the juvenile court with jurisdiction to appoint a hew attorney for the mother and that this court then grant the mother’s new counsel 28 days to respond to -DHR’s brief. This court granted that motion on April 3, 2015.
We note that the Alabama Rules of Appellate Procedure provide certain procedural safeguards on appeal to assure that parties are served with certain papers filed with appellate courts, including briefs. Specifically Rule 25(b), Ala. R.App. P., provides that
“[c]opies of all documents filed by any party ánd not required by these rules to be served by the clerk shall, at or before the time of filing, be served by a party or person acting for him on all other parties to the appeal or review. Service on a party represented by counsel shall be made on counsel.”
Rule 25(c), Ala. R.App. P., provides for the manner in which a document must be served. Rule 25(d), Ala. R.App. P., requires the filing party to acknowledge service "in the form of a statement of the date and manner of service and of the names of the persons served, certified by the person who made service.” Additionally, “Rule 31, Ala. R.App. P., requires that a copy of an appellant’s brief be served upon opposing counsel within 28 days of the completion of the record, which is the date upon which, excluding any extensions, an ap-pellarit’s brief is due.”' M.B. v. R.P., 3 So.3d 237, 243 (Ala.Civ.App.2008). We also note that Rule 1.7 and Rule 1.16, Alabama Rules of Professional Conduct, require an attorney to withdraw from representation if a conflict of interest arises after the attorney undertakes representation.