Rel: January 5, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

## CL-2023-0263, CL-2023-0264, CL-2023-0265, and CL-2023-0266

_____

## K.M.

## v.

## Houston County Department of Human Resources

## Appeals from Houston Juvenile Court
## (JU-20-619.02, JU-20-620.02, JU-20-621.02, and JU-20-622.02)

_____

## CL-2023-0268, CL-2023-0269, CL-2023-0270, and CL-2023-0271

_____

## C.W., Jr.

## v.

## Houston County Department of Human Resources

CL-2023-0263; CL-2023-0264, CL-2023-0265, CL-2023-0266, CL-2023-0268, CL-2023-0269, CL-2023-0270, and CL-2023-0271

**Appeals from Houston Juvenile Court**
**(JU-20-619.02, JU-20-620.02, JU-20-621.02, and JU-20-622.02)**

PER CURIAM.

The Houston County Department of Human Resources ("DHR") filed actions to terminate the parental rights of K.M. ("the mother") and C.W., Jr. ("the father"), to four of their children. The Houston Juvenile Court ("the juvenile court") conducted a hearing at which it received ore tenus evidence over the course of two days, March 14, 2023, and March 27, 2023. On April 17, 2023, the juvenile court entered a separate judgment in each action in which it ordered that the parental rights of the mother and the father to each of the four children be terminated. The mother filed a postjudgment motion in each action, which the juvenile court denied. The mother and the father each filed a timely notice of appeal in each of the four actions in the juvenile court. The eight appeals were consolidated by this court, ex mero motu.

The record indicates that DHR investigated the parents' home in November 2020 and found it to be dirty and not a fit environment for their children. In addition, the mother and the father each tested positive for the use of methamphetamine. At that time, the parents had four

2

children ("the four children"), who were five years old, two years old, one year old, and two months old, respectively. The parents and DHR entered into a safety plan pursuant to which the four children would live with the mother's mother ("the maternal grandmother"). The maternal grandmother owns land on which is located her own home. Also located on that land, and also owned by the maternal grandmother, is the mobile home in which the mother, the father, and the four children were residing when DHR first became involved with the family. The record indicates that, as a result of the imposition of the safety plan, the mother, the father, and the four children began living in the maternal grandmother's home.

Asia McNeely, a child abuse/neglect worker for DHR, testified that on December 14, 2020, approximately two weeks after the parties had entered into the safety plan, DHR was contacted by law-enforcement officials concerning a domestic-violence incident at the maternal grandmother's home. McNeely stated that when she arrived the father's shirt was torn and the mother had a black eye. McNeely testified that the mother denied that a physical altercation between the mother and the father had occurred, and, she said, the mother insisted that there had

been only an argument between the two. At the final hearing in these cases, the mother testified that the argument had occurred between herself and the maternal grandmother and that the father had not been involved in the incident to which law-enforcement officers responded.

McNeely stated that on December 14, 2020, the maternal grandmother's home was in "disarray" and that, in addition to observing bags of trash crowding the home, she observed open food containers stacked next to cat-litter boxes. The mother, the father, and the maternal grandmother submitted to drug screens on that date, and the results for all three were positive for the use of methamphetamine. Based on the foregoing, McNeely said, the decision was made to place the four children in protective custody, and DHR initiated a dependency action with regard to each of the four children.

On December 22, 2020, the juvenile court entered a shelter-care order in each of the four dependency actions in which it placed the four children in the pendente lite custody of DHR. McNeely stated that, as a consequence of both the DHR investigation that had resulted in the November 2020 safety plan and her investigation that had been initiated on December 14, 2020, DHR found the mother, the father, and the

4

maternal grandmother to be "indicated" for physical abuse, chemical endangerment of the four children, neglect, and inadequate supervision.

The mother testified that complications arising from the COVID-19 pandemic delayed DHR's immediate provision of services for the family. Ashley Parr, the DHR social worker assigned to the four children's cases between February 2021 and May 2022, testified that, after the four children were placed in DHR's custody, DHR offered the parents a number of reunification services, including random drug screens; assessments by SpectraCare, a provider of substance-abuse-treatment services; parenting classes; anger-management classes; and visitation with the four children. Parr also testified that DHR requested that the parents repair and clean the mobile home in which they resided and that they each obtain and maintain stable employment.

Parr testified that she spoke several times to the parents about the need to attend substance-abuse treatment after she had received the results of their drug screens.[1] It is undisputed that both the mother and

---

[1]DHR did not present any testimony or documentary evidence concerning the frequency of the mother's and the father's drug screens or the results of those drug screens. The result of a drug screen was referred to only in passing during the DHR social workers' testimony.

the father were using methamphetamine at that time. According to Parr, both the mother's and the father's behavior and demeanor was consistent with that of a person using methamphetamine.

DHR presented evidence indicating that inpatient substance-abuse treatment was recommended for the father as a result of his use of methamphetamine. The father made a few attempts to attend an outpatient substance-abuse-treatment program offered by SpectraCare. However, Parr testified, the father either never attended that program or, if he did attempt the program, quickly left it. Parr also stated that, during an individualized-service-plan ("ISP") meeting that appears to have been conducted after the father had already failed to complete an outpatient substance-abuse-treatment program offered by SpectraCare, the father informed her that he believed that he needed to attend an inpatient substance-abuse-treatment program. Parr said that following that ISP meeting she made several referrals for the father to attend SpectraCare's inpatient program and another inpatient program offered by an entity referred to as "The Haven." Parr testified, however, that the father never attended either inpatient program. Thereafter, because of the father's repeated failure to attend the inpatient programs offered by

SpectraCare and The Haven after having been offered a place as a patient in those programs several times, those two entities refused to include the father as a patient in their programs. In his testimony at the final hearing, the father acknowledged that DHR had asked him to attend an inpatient substance-abuse-treatment program but that he had not done so.

Parr testified that the parents were given one hour of visitation with the four children each week, and that the parents had visited the four children consistently. However, she said, in April 2021 a domestic-violence incident between the parents occurred either shortly before they arrived at DHR's office for a visit or in the parking lot of DHR's office. The mother insisted at the final hearing that she and the father had engaged only in an argument. However, Parr testified that, immediately after that incident, the mother told her that the father had hit her, and, Parr said, she had observed that one of the mother's eyes was puffy and that the mother had fresh scratch marks on her neck. DHR contacted law-enforcement officers, the father was arrested on a domestic-violence charge, and he remained incarcerated for approximately 30 days. The mother was allowed to proceed with the visitation with the four children.

The mother explained that she and the father had never married but that the father had been living with her for several years before the birth of their oldest child, who was seven years old at the time of the final hearing. The mother testified that the father had been physically abusive to her before their children were born. However, she denied that the father had abused her recently. Also, the mother specifically disputed Parr's testimony that she had had a black eye in December 2020, when Parr removed the four children from the parents' custody.

The mother acknowledged that three domestic-violence charges had been alleged against her since 2017. The mother testified that those incidents of domestic violence had involved the mother and the maternal grandmother; she stated that the father had not been involved in those incidents. During the time the four children have been in foster care, the mother has been arrested at least twice for failing to appear at court hearings regarding those criminal charges. According to the mother, she had also incurred in the past a charge relating to an altercation at a local store. The mother testified that all of those charges had been dismissed at the time of the final hearing, and, she said, she had "cleared up" all the failure-to-appear warrants issued against her.

8

The mother admitted that she, the father, and the maternal grandmother were using methamphetamine when DHR became involved with the family. The mother denied that she had ever "struggled" with drug addiction. Instead, she said, she had been a recreational drug user. She stated that she began using methamphetamine in April 2020, after she lost her employment as a result of the COVID-19 pandemic. The mother initially stated that she had stopped using methamphetamine in March 2021. However, she later admitted that she had used methamphetamine occasionally until September 2021. The mother explained that she had continued to use methamphetamine when she felt "defeated."

The mother testified that she had attended a substance-abuse-treatment program offered by SpectraCare for one year; the record does not disclose the dates she attended that program. The mother stated that she had last used methamphetamine in September 2021 and that, by the time of the final hearing, she had been "clean" for almost 18 months. The mother also presented evidence indicating that she had completed a parenting class in February 2021 and an anger-management class in October 2022. The mother testified that she and the father had separated

from approximately September 2021 through August 2022 and that the two had not lived together during that period.

Parr also testified that, in addition to DHR's concern about the mother's use of illegal drugs, it also had concerns about the mother's overall mental health based on her occasionally erratic behavior. Parr explained that the mother had acted erratically when she missed a visit and when she did not get her way. For example, Parr testified, in November 2021 the mother was late to a visitation, and the four children had left DHR's office before the mother arrived. On that occasion, Parr said, the mother told Parr that she knew where Parr lived, where Parr's children attended school, and that she would "fight to the death" for her own children. Parr testified that the mother's behavior, and the fact that the four children had been removed from the mother's custody, caused her to be concerned about the mother's mental health. Therefore, because of that behavior, after the April 2021 domestic-violence incident, Parr recommended and that both parents obtain counseling and that the father attend anger-management classes.

The mother testified that although she had attended a psychological evaluation, she was unaware of any diagnoses that might

10

have resulted from that evaluation. The mother explained that although she had asked for the results of the evaluation, she had never been allowed to see the evaluation report. The mother testified that, after the psychological evaluation, she attended an appointment with a psychiatrist who prescribed medications for "mild depression" and other medications to help her sleep. The mother admitted that she no longer took those medications because, she said, they made her very ill.

Parr stated that she had made referrals for the mother and the father to attend individual counseling with Everlasting Peace, which provided in-home counseling services. The mother and the father each took part in a few counseling sessions with Stephanie Govan, who worked for Everlasting Peace. Parr said that the mother appeared to have worked well with Govan. However, Govan informed DHR at some point that she was no longer able to contact the mother or the father to arrange services and that, for that reason, no further counseling services could be provided by Everlasting Peace. On cross-examination, when the mother's counsel asked Parr if Govan had lost contact with the mother because the mother had been in jail, Parr stated that that was possible, but she later

said that both she and Govan had continued to have difficulty contacting the mother.

With regard to the condition of the mobile home in which the parents resided, DHR presented evidence indicating that the home was dirty and in disarray, and that, when the four children were removed from the parents' custody in December 2020, the home had no plumbing. McNeely testified that the four children had played and slept in the living room of the mobile home. The outside of the mobile home was also a safety concern identified by DHR. Evidence presented by DHR demonstrated that the front porch was high off the ground and cluttered with debris and that spindles serving as a partial guardrail were missing in places. In addition, there were no steps to reach the front porch. During the pendency of the underlying dependency actions, the front porch was further damaged by a fire. The DHR social workers described the back porch as cluttered and as containing a nonfunctioning refrigerator.

Tammy Summers, a worker in the court-appointed-special-advocate ("CASA") program who was assigned to the four children's cases from June 2021 through October 13, 2022, testified and confirmed Parr's descriptions of the inside and the outside of the mobile home in which the

12

parents resided. Summers also testified regarding the services that had been provided to the parents. Summers acknowledged that the father did not have his own transportation and that that had impacted his ability to access some services. However, Summers said, DHR had provided taxi services for the father until the taxi company refused to transport the father any longer; the juvenile court sustained the father's objection to additional testimony on that issue, thereby preventing Summers from explaining the reason the taxi company would no longer transport the father.

Parr testified that, at the time she stopped being the social worker assigned to the four children's cases in May 2022, the inside of the mobile home was much improved. The mother testified that she had worked on the inside of the mobile home and had placed beds in bedrooms for the four children; she also stated that she had decorated the four children's bedrooms. Parr stated that, at the time of her last visit to the home, her only concerns were some open food containers and some broken glass in a bedroom. Parr stated, however, that outside of the mobile home, the yard was overgrown and the porches remained a safety concern.

13

On April 1, 2022, approximately one month before Parr stopped being the social worker assigned to the four children's cases, DHR filed petitions seeking to terminate the parental rights of the mother and the father to each of the four children. Parr testified that, when she left the four children's cases in May 2022, the father was not receiving substance-abuse treatment and had not attended anger-management classes. In the dependency actions, the juvenile court entered adjudicatory orders on April 22, 2022, in which it found the four children dependent based on the admissions of the parents and awarded custody of the four children to DHR.

One month later, on May 18, 2022, the mother gave birth to a fifth child ("the youngest child"). The youngest child was immediately placed in the custody of A.M., a family friend, pursuant to a safety plan. It is undisputed that, at the time of the final hearing, the youngest child remained in the custody of A.M. The mother testified that she visits with the youngest child almost daily and that A.M. is a friend who provides her emotional support.

The mother stated that, when the youngest child was born, she began seeing a change in the father. The father initially stated that he

14

stopped using methamphetamine in May 2022 but then stated that he continued to use that drug on occasion when he felt "down and defeated" through early June 2022. The father testified that he began substance-abuse treatment with Dr. Earl Jones at Houston County Drug Treatment. The record, including Dr. Jones's testimony, establishes that the father began that 12-week intensive outpatient substance-abuse-treatment program ("the treatment program") on June 7, 2022, and that he completed that program in September 2022. The father testified that he had "made a conscious decision" to seek substance-abuse treatment "for the kids." However, later testimony established that the father had been referred to the treatment program through a court referral as a result of a criminal charge against him; it is not clear whether that criminal charge was recent or related to earlier charges against the father that had not yet been resolved.

The father testified that because SpectraCare would no longer take him as a patient, he had "applied my own money and paid my own money to get services by myself" through the treatment program. However, on direct questioning from the juvenile court, the father stated that the mother's stepfather had paid for the treatment program. The costs of the

15

treatment program were $185, plus $35 per week for a urine drug screen. The father stated that he has been "clean" since June 6, 2022.

Dr. Jones, the director of Houston County Drug Treatment, the entity that offered the treatment program, testified that the father had been referred to the treatment program by a court referral office. Dr. Jones stated that, although the father had an initial positive drug screen upon entering the treatment program, the father's drug screens during his participation in the treatment program had been negative. Further, based on the father's appearance and demeanor, he opined that the father had maintained his sobriety after completing the treatment program. The father testified that he continued to see Dr. Jones, and Dr. Jones explained that the father had occasionally stopped in at the facility where the treatment program is offered. Dr. Jones stated that the father had taken drug screens on those occasions, but he admitted that the father had determined the timing of those drug screens, i.e., that they were not random.

Both the mother and the father testified about an incident that had occurred on July 25, 2022. The mother testified that, on that date, she and the father were traveling to visit the youngest child and A.M. in

16

Panama City, Florida. Houston County Sheriff's Deputy Charles Gray conducted a traffic stop on the parents' vehicle because of speeding. Deputy Gray discovered that both parents had outstanding warrants, and he placed the mother and the father under arrest and transported them to the Dothan police department. The mother testified that Deputy Gray repeatedly warned the parents that he would search his police vehicle after they left the vehicle and that if they had any illegal substances with them, it would be better to inform him rather than for him to find them in his vehicle.

Deputy Gray confirmed that part of the mother's testimony. He explained that, before he leaves in his police vehicle at the beginning of his shift, he checks to make sure the back of the vehicle is clean and he lifts the back seat to ensure that nothing has been left in the vehicle. Deputy Gray testified that he completed that inspection of his police vehicle at the beginning of his shift on July 25, 2022, and that the parents were the first occupants of his vehicle on that date. Deputy Gray also stated that, after the parents left his police vehicle and were placed in the custody of the Dothan police department, he again searched the

17

vehicle and located a small plastic sack that was later determined to contain methamphetamine.

The mother and the father each denied that they had any methamphetamine with them or that they had intended to use that illegal drug while in Florida. The father insisted that the methamphetamine was already in the police vehicle and that Deputy Gray must have been mistaken that he had thoroughly searched the vehicle before the parents entered the vehicle. Regardless, because of the substance found in Deputy Gray's police vehicle, the father was charged with possession of a controlled substance.

The father testified that, on the day following that arrest, he attended the treatment program and requested a drug screen; Dr. Jones confirmed that the results of that drug screen were negative. DHR questioned the father regarding whether he had the methamphetamine with him and intended to use it at the beach while visiting the youngest child and A.M. The father denied that that had been his intention, and Dr. Jones stated that he believed that if the father had had methamphetamine, the father likely would have used it immediately.

The mother testified that in August 2022 she and the father began living together again. At that time, she said, the father was sober and doing well. She stated that she believed that the father had gotten "with the program" and had adjusted his life to be able to parent the four children. Anna Starling was the DHR social worker assigned to the four children's cases from May 2022 through September 2022 and again from December 2022 through the dates of the final hearing in March 2023.[2] Starling testified that DHR had suspected that the parents had resumed their relationship because they had been arriving for and leaving visitations together for some time. However, she said, it was not until January 2023 that the parents first admitted to DHR that they had resumed living together.

At the final hearing, the father testified that he had been a drug addict but that he was not any longer. The father testified that he was a different person than the person he had been when using methamphetamine, and he insisted that he would not return to using

---

[2]Starling explained that in September 2022 the four children's cases were assigned to another DHR social worker because Starling had too many cases assigned to her at that time. However, the other social worker left DHR in December 2022, and the four children's cases were again assigned to Starling.

illegal drugs. The father admitted that he had missed a lot of the four children's lives because of the use of illegal drugs and because that drug use had resulted in the four children being placed in DHR's custody. Parr stated that, at the time of the final hearing, the father looked much different than he had when she first met him in February 2021, when, she said, he exhibited characteristics consistent with the use of methamphetamine, such as being jittery, dilated pupils, and profuse sweating. Parr stated that the father had also gained some weight.

The father stated that he had had a domestic-violence charge and a shoplifting charge from before the time the four children were removed from his custody. The father had also been arrested several times while the four children were in foster care because of his failure to appear for court hearings on several criminal charges pending against him. The father admitted that he still has to pay fines and attend court hearings pertaining to those charges. Also, at the time of the final hearing, the father was still facing a charge for the possession of a controlled substance in relation to the July 2022 arrest.

Starling testified that, when she began working on the four children's cases in May 2022, the inside of the parents' home was

sometimes not clean, often had food left on the counters, and had cleaning supplies left out, implying that the cleaning supplies would be accessible to young children. Starling's testimony indicated that the condition of the porches to the mobile home remained the same as already described herein. However, the mother and the father each testified that they had repaired the porches in the three weeks before the first day of the final hearing on March 14, 2023. Starling testified that she had visited the parents' mobile home a week before the second day of the final hearing and confirmed that those repairs had been made. Starling stated, however, that she was concerned that the parents had not addressed the repairs to the porches earlier.

The mother testified that she and the father had struggled to repair the porches but that, at the time of the final hearing, those repairs had been made. Also, the mother testified that, at the time of the final hearing, the maternal grandmother was no longer living on the property on which the mobile home was located.

Lori Killingsworth, a CASA-program worker assigned to the family since December 2022, testified that, during the three months that she had worked on the cases before the final hearing, the parents appeared

remorseful about their conduct that had resulted in the four children being placed in foster care. Killingsworth said that her interactions with the parents had been positive, that the four children were bonded with the parents and were happy to see them at visits, and that she believed that the four children should be returned to the parents' custody. Killingsworth also acknowledged that each of the four children were also bonded with their respective foster parent or foster parents.

With regard to employment, the father admitted that he had been unemployed for approximately one and a half years while the four children were out of his custody. He explained that his use of illegal drugs had prevented his being able to obtain or maintain employment. The father testified that he had been briefly employed in November 2022 and that in January 2023 he had worked at a chain restaurant but he had not been assigned enough work hours to earn sufficient income. For that reason, the father said, he had opted to work for a different restaurant. The father testified, however, that he lost his wallet and his identification and that, because he lacked identification, he could not be placed on the payroll for the second restaurant. The father testified that, after he left his employment at the second restaurant in February 2023, he began

working for a landscaping company. The mother stated that the father had been working for the landscaping company for approximately two weeks. The mother and the father each stated that the father expected to receive his first paycheck from the landscaping company on the Friday after the March 14, 2023, portion of the final hearing; for that reason, the mother said, she did not know the amount of the father's current income. The father testified that he had been hired for a full-time position at a rate of pay of $12.50 per hour. No evidence was presented at the March 27, 2023, portion of the final hearing regarding whether the father had received that paycheck or remained employed by the landscaping company.

Starling testified that, when she last spoke to the father, he had stated that he was unemployed but planned to begin working for a landscaping company. Starling testified that she had asked the father to bring his paperwork for that job to the most recent visitation with the four children but that he had not done so.

At the time of the final hearing, the mother had been employed for approximately nine months at a beauty-supply store. The mother testified that she often opened or closed that store and that she had the

keys to that store. The mother's store manager testified that the mother was a good employee and that the mother worked approximately 29 hours a week because the store management had initially wanted the mother to be a part-time employee. However, the store manager said, she expected to be able to promote the mother to a full-time assistant-manager position in April 2023.

Evidence was presented indicating that neither the mother nor the father had contributed to the four children's support during the time they had been out of the parents' custody. The mother testified that there were toys and clothes for the four children at the mobile home but that she was waiting to use them upon the return of the four children to her custody. The father testified that he had recently discussed with DHR social workers the possibility of providing clothes to the four children's respective foster parents. A few months before the final hearing, the mother had provided some clothes for the four children. The mother had also provided the four children with gifts of toys during some visits.

At the time of the final hearing, each of the four children was in a separate foster home. The current foster mothers for each of the four children testified at the final hearing. That testimony indicated that two

of the four children had been in the same, but separate, foster homes since they had been removed from the parents' custody in December 2020. The youngest of the four children was three years old at the time of the final hearing and had been in the same foster home since June 1, 2021; that child had spent more time in his foster home than he had in the custody of the parents. The oldest of the four children was seven years old at the time of the final hearing, and he had transferred foster homes several times because of his behavioral outbursts. At the time of the final hearing, that child had been in his current foster home for 10 months, and he was doing well.

All of the foster parents who testified at the final hearing stated that the four children were doing well in their respective foster homes and benefiting from the routine provided in their homes. Each of those foster parents stated that they were emotionally bonded with their foster child, that their foster child loved them and their family, and that they wanted to adopt their foster child if the mother's and the father's parental rights were terminated.

The parents have had one hour of visitation with the four children each week, and each has exercised that visitation consistently. The DHR

social workers testified that, other than the incident before the April 2021 visit, the parents' visitations with the four children went well. Summers testified that the four children are bonded with the parents and with each other. Two of the foster mothers stated that they had observed a bond between the parents and the four children in their care.

Summers and Starling pointed out in their testimony that, at the time of the final hearing, the four children had been in foster care for two years and three months. They both opined that the parents had had sufficient time to attempt to reunite with the four children and to demonstrate their long-term ability to parent the four children. DHR also presented evidence indicating that there were no relatives who were willing or appropriate placement alternatives for the four children.

In a termination-of-parental-rights action, a juvenile court must apply a two-pronged test by determining whether the child is dependent, i.e., whether there are grounds warranting the termination of the parent's parental rights, and whether there exists a viable alternative to termination. Ex parte T.V., 971 So. 2d 1, 4 (Ala. 2007) (citing Ex parte Beasley, 564 So. 3d 950, 945-55 (Ala. 1990)). Section 12-15-319, Ala. Code 1975, which is a part of the Alabama Juvenile Justice Act ("the AJJA"),

26

CL-2023-0263; CL-2023-0264, CL-2023-0265, CL-2023-0266, CL-2023-0268, CL-2023-0269, CL-2023-0270, and CL-2023-0271

§ 12-15-101 et seq., Ala. Code 1975, sets forth the grounds for termination of parental rights and a nonexclusive list of factors for a juvenile court to consider when determining whether to terminate a parent's parental rights. Although this court has stated that, in deciding whether to terminate parental rights, a juvenile court must determine whether a child is "dependent" and also whether there are viable alternatives to termination, see, e.g., B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004), and similar cases, the use of the term "dependent" within the framework of a termination-of-parental-rights action is inaccurate or misleading. In the context of a termination-of-parental-rights action, the courts' use of the term "dependent" in previous cases does not refer to that term as defined by the AJJA in § 12-15-102(8), Ala. Code 1975. Instead, "[i]n order for the juvenile court to make a finding that a child is dependent in a case involving termination of parental rights, the juvenile court must first determine by clear and convincing evidence that grounds [under § 12-15-319] for termination of parental rights exist." Talladega Cnty. Dep't of Hum. Res. v. J.J., 187 So. 3d 705, 711 (Ala. Civ. App. 2015). See also Ex parte T.V., 971 So. 2d 1, 4 (Ala. 2007) ("For a finding of dependency, the court must consider whether there are grounds for

27

CL-2023-0263; CL-2023-0264, CL-2023-0265, CL-2023-0266, CL-2023-0268, CL-2023-0269, CL-2023-0270, and CL-2023-0271

terminating the parental rights, including but not limited to the grounds specified in [former] § 26-18-7[, Ala. Code 1975, now § 12-15-319, Ala. Code 1975]."). Therefore, in considering an action involving a claim seeking to terminate a parent's parental rights, the courts must apply the two-pronged test.

> "'Once the court has complied with this two-prong test -- that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child -- it can order the termination of parental rights.'"

Ex parte T.V., 971 So. 2d at 5 (quoting Ex parte Beasley, 564 So. 2d at 945-55).

> "A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

>> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the

28

> > trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly ... establish the fact sought to be proved."

> "'KGS Steel[, Inc. v. McInish,] 47 So. 3d [749] at 761 [(Ala. Civ. App. 2006)].

> > "'… [F]or trial courts ruling ... in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'

> "Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id."

E.A.D. v. Randolph Cnty. Dep't of Hum. Res., 369 So. 3d 1069, 1071-72

(Ala. Civ. App. 2022).

29

CL-2023-0263; CL-2023-0264, CL-2023-0265, CL-2023-0266, CL-2023-0268, CL-2023-0269, CL-2023-0270, and CL-2023-0271

In its nearly identical, April 17, 2023, judgments entered in each of the four actions, the juvenile court found that the grounds for terminating parental rights identified in § 12-15-319 -- specifically, that the parents were unwilling or unable to discharge their parental responsibilities to the four children and that their conduct or condition was unlikely to improve in the foreseeable future -- existed. In addition, the juvenile court determined that there was no viable alternative to the termination of the mother's and the father's parental rights and that the termination of the mother's and the father's parental rights was in the four children's best interests.

The mother argues that the juvenile court erred in terminating her parental rights. She contends, in essence, that she had adjusted her circumstances to meet the needs of the four children. DHR presented little evidence regarding the mother's participation in reunification services; it focused much of its presentation of the evidence on services offered to the father. For example, other than admitting that, at some point, the mother had attended a substance-abuse-treatment program offered by SpectraCare, DHR presented no evidence concerning the mother's substance-abuse treatment, and it submitted no evidence to the

30

juvenile court regarding any drug screens in which the mother might have participated.

The mother contends that she had attained and maintained sobriety by the time of the final hearing. The undisputed evidence in the record is that the mother stopped using methamphetamine in September 2021, and, she said, she had been sober since that time. Thus, at the time DHR filed its April 1, 2022, termination-of-parental-rights petitions, the mother had been sober for approximately 7 months, and she had remained sober for approximately 18 months by the time of the final hearing.

The record indicates that the mother had completed parenting classes and anger-management classes. The mother also stated that she had participated in psychological and psychiatric evaluations and that she had participated in counseling offered through the Exchange Center. Summers testified that the mother had completed the counseling. Parr testified that counseling for the mother with a different provider had gone well until that counselor lost contact with the mother. Other than citing the mother's stress from the involvement of DHR in the family and having lost custody of the four children, her veiled threats to Parr, and

her statement that she would fight to the death for her children, DHR failed to present any evidence indicating that the mother had a psychological or psychiatric condition for which further counseling was recommended or necessary.

The mother also obtained employment in June 2022. Although it might be argued that the mother obtained employment only after DHR had filed its termination-of-parental-rights petitions, we note that the mother gave birth to the youngest child in May 2022, shortly after DHR had filed those termination petitions. Thus, the mother obtained employment shortly after the birth of her youngest child. The record demonstrates that the mother has maintained that employment, and she presented evidence indicating that she was to be promoted to a managerial position shortly after the final hearing.

The condition of the interior of the mobile home in which the parents lived did not appear to be an issue for DHR by mid-2021. However, until three weeks before the final hearing, the parents had failed to repair the porches to address safety concerns about the outside of their home. In addition, the record would support the conclusion that both the mother and the father were untruthful about and minimized the

32

extent of the domestic violence between them and that, other than the mother providing toys and clothes on one occasion, neither parent has contributed to the support of the four children. We do not consider those issues to be unimportant. However, DHR's evidence indicates that the most recent incident of possible domestic violence between the mother and the father occurred in April 2021, which was before either parent stopped using methamphetamine. Also, DHR's child-support division did not obtain an order requiring the mother and/or the father to pay child support during the time the four children have been out of their custody. The record does not indicate whether DHR social workers encouraged the mother and/or the father to provide financial or other forms of support for the four children.

The record indicates that, when she first ceased using methamphetamine, the mother made the father move out of the family's mobile home because he was continuing to abuse illegal drugs. The father presented evidence indicating that he had occasionally been sober for as long as one month during the time the four children have been out of the parents' custody. However, the mother had not allowed the father to return to the family home until, she said, she believed that there was an

33

actual and observable change in the father, i.e., that he had stopped, or was legitimately attempting to stop, using illegal drugs. At the time the father resumed living with the mother in August 2022, he had been in substance-abuse treatment for approximately two months and was testing negative for the use of illegal drugs. Thus, the evidence demonstrates that the mother is willing to remove the father from her residence if he fails to maintain his sobriety.

In these cases, DHR filed its petitions to terminate the mother's and the father's parental rights approximately 16 months after the four children had been removed from the parents' custody. An additional year elapsed between when DHR filed its petitions to terminate the mother's and the father's parental rights and the final hearing; the record indicates that these cases were continued twice on the motion of DHR, once on the father's motion, and once because of a conflict in the juvenile court's docket. During that extensive delay in bringing these cases to trial, the four children's bonds with their respective foster parents continued to strengthen. However, the record also demonstrates that each of the four children remain closely emotionally bonded with their parents and with each other.

34

CL-2023-0263; CL-2023-0264, CL-2023-0265, CL-2023-0266, CL-2023-0268, CL-2023-0269, CL-2023-0270, and CL-2023-0271

The four children were removed from the mother's custody because of her drug use, because of concerns of domestic violence within the home, and because of the condition of the mobile home in which the family was living. At the time of the final hearing, DHR did not present evidence indicating that, with regard to the mother, those issues remained a concern. "This court has consistently held that the existence of evidence of <u>current</u> conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on <u>clear and convincing evidence</u>." <u>D.O. v. Calhoun Cnty. Dep't of Hum. Res.</u>, 859 So. 2d 439, 444 (Ala. Civ. App. 2003) (final emphasis added). Given the mother's circumstances at the time of the final hearing, we conclude that the juvenile court erred in determining that DHR had presented clear and convincing evidence indicating that the mother was unwilling or unable to properly parent the four children. Therefore, because DHR failed to present sufficient evidence as to one of the two prongs of the test discussed in <u>Ex parte T.V.</u>, supra, we hold that the juvenile court erred in terminating the mother's parental rights. We pretermit discussion of the mother's arguments concerning whether the evidence supports a

35

determination that DHR made reasonable efforts to reunite her with the four children and whether there were viable alternatives to the termination of her parental rights.

The father also argues that the juvenile court erred in determining that there were grounds warranting the termination of his parental rights, i.e., that he was either unable or unwilling to properly parent the four children and to meet the four children's needs. The father's argument challenging the basis for the termination of his parental rights to the four children poses a closer question than that asserted by the mother. The record demonstrates that the father attended parenting classes and anger-management classes. However, it is not clear if he participated, even briefly, in individual counseling. Also, the father did not seriously attempt any substance-abuse treatment until two months after DHR filed its petitions seeking to terminate his parental rights. The evidence would support a determination that the father's attempts at reunification with the four children were intended only to forestall the termination of his parental rights. See A.M.F. v. Tuscaloosa Cnty. Dep't of Hum. Res., 75 So. 3d 1206, 1213 (Ala. Civ. App. 2011); and K.J. v. Pike Cnty. Dep't of Hum. Res., 275 So. 3d 1135, 1145 (Ala. Civ. App. 2018).

36

However, because of the delay in trying these cases, at the time of the final hearing, the father had been sober and had not used illegal drugs for approximately nine months. The father was also employed and had stable housing with the mother.

In J.G. v. Lauderdale County Department of Human Resources, [Ms. 2210452, Jan. 13, 2023] ___ So. 3d ___, ___ (Ala. Civ. App. 2023), the Lauderdale County Department of Human Resources ("the Lauderdale County DHR") filed petitions to terminate the parental rights of M.G. and J.G., the mother and the father of four children. The Lauderdale Juvenile Court entered judgments denying the petitions to terminate M.G.'s parental rights but granting those petitions so far as they sought to terminate J.G.'s parental rights. The Lauderdale County DHR had found J.G. to be "indicated" for the neglect and abuse of his children and for the abuse of his stepchild. In addition, the record indicated that J.G. had committed domestic violence against M.G., had failed to participate in reunification services, had visited the four children only sporadically, and had last visited them approximately 18 months before the termination-of-parental-rights judgments were entered. In addition, the father had failed to participate in substance-abuse treatment. In contrast, M.G. had

cooperated with the Lauderdale County DHR's reunification efforts and had divorced J.G. before the Lauderdale County DHR filed its termination petitions.

This court reversed the termination judgments in J.G., supra, relying in part on J.C.D. v. Lauderdale County Department of Human Resources, 180 So. 3d 900, 901 (Ala. Civ. App. 2015), stating, in part, that the "'termination of the parental rights of a noncustodial parent is not appropriate in cases in which the children can safely reside with the custodial parent and the continuation of the noncustodial parent's relationship does not present any harm to the children.'" J.G., ___ So. 3d at ___. In addition, this court noted that there were no potential adoptive resources for the four children. J.G., ___ So. 3d at ___.

In this case, unlike in J.G., supra, the mother and the father remain in a relationship and are living together. Thus, the premise that the four children's safety when visiting with a noncustodial parent would be ensured by the custodial parent is not applicable here, as it was in J.G., supra, and in J.C.D., supra. However, the record does establish that the mother would not allow the father to live with her while she was attaining sobriety and he was still abusing illegal drugs. DHR presented

38

no evidence indicating that the mother, while sober, lacked the capacity to protect the four children from any possible negative behavior of the father. Also, there is no limitation upon the conditions the juvenile court may place on a future return of custody of the four children to the mother. The juvenile court is free to specify that the father have only limited contact with the four children until he proves that he has maintained his own sobriety. Moreover, because we have reversed those parts of the judgments that terminated the mother's parental rights, the four children may not, at this time, be adopted by others even if this court were to affirm those parts of the judgments terminating the father's parental rights.

In J.G., supra, this court declined to create a bright-light rule that the ability to safely return custody of a child or children to one parent would prevent the termination of the parental rights of the other parent, based on the viable-alternatives prong discussed in Ex parte T.V., supra. In these cases, we again make no such bright-line rule. Instead, we hold that, given the progress made by the father over the nine months preceding the final hearing, and given that we have reversed the termination of the mother's parental rights, the juvenile court also erred

CL-2023-0263; CL-2023-0264, CL-2023-0265, CL-2023-0266, CL-2023-0268, CL-2023-0269, CL-2023-0270, and CL-2023-0271

in terminating the father's parental rights in these specific cases. Even assuming that the juvenile court did not err in determining that the father was unable or unwilling to adjust his circumstances to meet the needs of the four children, under the particular facts of these cases, we conclude that there was a viable alternative to the termination of the father's parental rights. Accordingly, based on the specific facts in these cases, we reverse the judgments and remand the causes to the juvenile court.

CL-2023-0263 -- REVERSED AND REMANDED.

CL-2023-0264 -- REVERSED AND REMANDED.

CL-2023-0265 -- REVERSED AND REMANDED.

CL-2023-0266 -- REVERSED AND REMANDED.

CL-2023-0268 -- REVERSED AND REMANDED.

CL-2023-0269 -- REVERSED AND REMANDED.

CL-2023-0270 -- REVERSED AND REMANDED.

CL-2023-0271 -- REVERSED AND REMANDED.

Moore, Edwards, Hanson, and Fridy, JJ., concur.

Thompson, P.J., concurs in the result, without opinion.